NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3676
_____

UNITED STATES OF AMERICA

v.

SOLOMON MANAMELA,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-09-cr-00294-002
District Judge: Honorable Stewart Dalzell

Argued on July 16, 2015

Before: SMITH, GREENAWAY, JR. and SHWARTZ, *Circuit Judges*

(Filed: August 18, 2015)
_____

Vineet Gauri, Esq.
Joseph F. Minni, Esq.
Bea L. Witzleben, Esq.        [ARGUED]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106
        *Counsel for Appellee*

Michael S. Doluisio, Esq.
Charlotte K. Newell, Esq.
Dechert LLP
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA  19104

Zachary Ewing, Esq.    [ARGUED]
University of Pennsylvania
School of Law
3400 Chestnut Street
Philadelphia, PA 19104
   *Counsel for Appellant*

———————————

OPINION[*]

———————————

SMITH, *Circuit Judge.*

Defendant-Appellant Solomon Manamela challenges the denial of his motion under 28 U.S.C. § 2255 "to vacate, set aside or correct" his sentence related to his conviction of six counts of health care fraud in violation of 18 U.S.C. § 1347 by the U.S. District Court for the Eastern District of Pennsylvania. For the reasons that follow, we will affirm.

I.

The City of Philadelphia provided services to needy families through its Department of Human Services ("DHS"). Among the many services offered, the Services to Children in their Own Homes ("SCOH") program provided in-home social services for children identified as being at risk of neglect, abuse, and delinquency. The City contracted with private companies to provide services to identified families ("SCOH providers"). SCOH providers then had social workers ("SCOH workers") assess, assure, and document the safety of the children during every face-to-face contact with a child.

———

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

This face-to-face contact provided an opportunity for the SCOH workers to monitor an at-risk child's receipt of medical care and the child's medical condition. The City established different levels of service depending upon the degree of risk at issue in each case. To ensure that these services were being provided, the City required SCOH providers to create a formal alert when a face-to-face visit did not occur, submit a report on families every three months, and maintain a file on each family. The United States Department of Health and Human Services ("HHS") funded the SCOH program through HHS's Temporary Assistance to Needy Families ("TANF") program.

In 2000, Manamela co-founded MultiEthnic Behavioral Health, Inc. ("MEBH"). Manamela served as MEBH's Human Resources and Staff Development Director. MEBH's contract with the City's DHS required MEBH to provide "comprehensive family based services," including "[s]tructured interventions" that included "[p]reventive health," and "[a]dvocacy for acquiring, coordinating, and monitoring the use of other community resources." J.A. 114. The advocacy component of the contract covered "[h]ealth," "[m]ental health," and "[d]rug and alcohol" family needs. *Id.* The records and documentation collected as part of the SCOH program provided the City with assurance that they "ha[d] a caregiver that's following through with the medical care of the child and is allowing . . . medical professionals to have access to that child." J.A. 472; J.A. 396 ("The defendants were paid to make sure these children were seeing a doctor."). The contract also provided for the provision of other services, such as legal, employment, child care, and housing services. MEBH renewed the contract with the City annually until things fell apart in 2006 and 2007.

3

On August 4, 2006, a 14-year-old girl purportedly receiving SCOH services from MEBH was found dead in her home. The girl was supposed to be receiving the highest level of supervision under the SCOH program, at least two visits per week, because she had cerebral palsy and was wheelchair bound. At the time of her death, she weighed a mere 42 pounds and had been suffering from severe dehydration, infected bed sores that had penetrated to the bone, and malnutrition. The City, the Philadelphia District Attorney, and the U.S. Government launched investigations of MEBH.

Those investigations revealed that from about July 2000 through about April 2007, Manamela and various other MEBH employees devised a scheme to defraud the SCOH program by: billing the City for services not rendered; failing to require MEBH supervisors to supervise SCOH workers; fabricating and falsifying records that were supposed to evidence that SCOH program services were being rendered to at-risk children; and fabricating records before and after the 14-year-old girl's death. This investigation resulted in a nineteen-count indictment against Manamela, including twelve counts of wire fraud in violation of 18 U.S.C. § 1343, six counts of health care fraud in violation of 18 U.S.C. § 1347, and one count of conspiracy to obstruct a matter within the jurisdiction of a federal agency in violation of 18 U.S.C. § 371.

Manamela proceeded to trial along with some other indicted MEBH employees. Manamela's counsel did not challenge the applicability of the health care fraud statute to the services MEBH was supposed to have provided. Instead, he challenged the credibility of the government's witnesses and attempted to distinguish Manamela's conduct from that of the other defendants. The jury found Manamela guilty on all counts.

Manamela was sentenced to 168 months' imprisonment and was ordered to pay a $1,900 special assessment and restitution of $1,216,000.[1]

On May 1, 2013, Manamela filed a *pro se* motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Relevant to this appeal, Manamela argued that counsel did not "adequately investigate the case [at trial] and present exculpatory evidence on the health care fraud charges." J.A. 247. Manamela further argued that his "appellate counsel was ineffective because he 'failed to present and argue the fact that [Manamela's] conviction for health care fraud cannot stand because the contract agreement to provide social services does not include providing health care services.'" J.A. 5. Manamela also requested discovery and an evidentiary hearing in support of his motion.

On August 12, 2013, the District Court denied Manamela's motion, denied the request for further discovery, and declined to issue a certificate of appealability. Manamela then sought a certificate of appealability from this Court,[2] which we granted as to the "claim that trial counsel was ineffective for failing to develop and present . . . an argument that [Manamela] did not violate 18 U.S.C. § 1347 because his conduct was not 'in connection with the delivery of or payment for health care benefits, items, or

---

[1] On June 14, 2010, Manamela filed a timely appeal challenging his sentence. We affirmed Manamela's conviction in a not-precedential opinion, rejecting Manamela's challenges to the District Court's admission of evidence and Manamela's sentence. *United States v. Manamela*, 463 F. App'x 127, 131–32, 134–36 (3d Cir. 2012).

[2] We thank pro bono counsel for their able representation of Manamela on appeal.

5

services.'" J.A. 20. Our grant included "the issues of whether the District Court erred in denying an evidentiary hearing and [Manamela's] request for discovery." *Id.*

## II.

The District Court had jurisdiction over Manamela's petition under 28 U.S.C. § 2255. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(c)(1). "'In a [§ 2255] proceeding, we exercise plenary review of the district court's legal conclusions and apply a clearly erroneous standard to the court's factual findings.'" *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014) (alteration in original) (quoting *Lambert v. Blackwell*, 134 F.3d 506, 512 (3d Cir. 1997)). We review the denial of an evidentiary hearing or discovery for abuse of discretion. *Han Tak Lee v. Glunt*, 667 F.3d 397, 404 (3d Cir. 2012); *United States v. McCoy*, 410 F.3d 124, 131 (3d Cir. 2005).

## III.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. A claim of ineffective assistance of counsel is governed by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Under *Strickland*, a challenger must prove that: (1) counsel's performance was deficient; and (2) there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *Id.* at 688, 691. Because a convicted defendant must satisfy both prongs of the *Strickland* test, failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Id.* at 699.

6

Our Court has "'endorsed the practical suggestion in *Strickland* to consider the prejudice prong before examining the performance of counsel prong[.]'" *Gov't of V.I. v. Vanterpool*, 767 F.3d 157, 165 n.8 (3d Cir. 2014) (alteration in original) (quoting *United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005)). A showing of prejudice "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)); *see also Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (reasoning that there was no prejudice under *Strickland* because the defendant would not have "prevailed on his insanity defense had he pursued it").

The various theories of prejudice proffered by Manamela require his underlying legal claim to have a "substantial" likelihood of creating a different result. *See Cullen*, 131 S. Ct. at 1403; *Vanterpool*, 767 F.3d at 165. Manamela's ineffective assistance claim is that counsel failed to argue that the health care fraud statute, 18 U.S.C. § 1347, did not apply to Manamela's conduct because: (1) Manamela did not defraud a "health care benefit program" as defined by 18 U.S.C. § 24(b); and (2) Manamela's actions were not "in connection with the delivery of or payment for health care benefits, items, or services" as required by 18 U.S.C. § 1347. Manamela states that the inapplicability of § 1347 to his conduct was "clear," "plain," and "apparent," such that "a cursory review of the case law" would have shown that his crimes did not constitute health care fraud. Appellant Br. 10, 11, 12, 25. We disagree.

We begin with Manamela's first argument regarding the scope of the term "health care benefit program." Manamela was convicted of violating 18 U.S.C. § 1347, which

7

criminalizes defrauding "any health care benefit program." The phrase "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).

As with all issues of statutory construction, "we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Our first step "'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). We "proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (alteration in original) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)). "We refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words." *United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) (referencing various dictionaries, including Black's Law Dictionary, Webster's Ninth New Collegiate Dictionary, and Webster's Third New International Dictionary).

Section 24(b) begins its definition of "health care benefit program" with the phrase

8

"*any* public or private plan or contract."  18 U.S.C. § 24(b) (emphasis added).  That the word "any" precedes the phrase "public or private plan or contract" is of great import. The American Heritage Dictionary of the English Language defines the adjective "any" as "[o]ne, some, every, or all without specification," and "[e]xceeding normal limits, as in size or duration."  The American Heritage Dictionary of the English Language 81 (5th ed. 2011).  Webster's Third New International Dictionary defines "any" as, *inter alia*, "one indifferently out of more than two: one or some *indiscriminately of whatever kind*," "all—used as a function word to indicate the maximum or whole of a number or quantity," and "a or some no matter how great or small—used as a function word to indicate what is considered despite its quantity or extent."  Webster's Third New International Dictionary 97 (1966) (emphasis added).

Contrary to Manamela's argument in his brief, § 24(b) does not require that a public or private plan or contract be an insurance provider or entity funded by an insurer. If Congress had intended to limit § 24(b) to insurers, it certainly could have done so.  *See Sebelius*, 133 S. Ct. at 1893 (declining to read an additional requirement into statutory text where Congress authorized attorney's fees irrespective of whether a petition was successful).  We are also persuaded by our sister courts that have rejected similar allegedly implicit limits on the scope of § 24(b).  *See United States v. Gelin*, 712 F.3d 612, 618 (1st Cir. 2013) (reasoning that the "statutory definition at issue is simple and broad"); *United States v. Lucien*, 347 F.3d 45, 50, 52 (2d Cir. 2003) (relying on the word "any" in rejecting the defendant-appellant's argument that § 24(b) applied "only to health care professionals, and that the New York State no-fault automobile insurance program

9

[was] not a 'health care benefit program' within the meaning of the statute").

We further reject Manamela's position that the SCOH program does not fall within § 24(b). Manamela's primary contention is that the social workers executing their duties were not doctors or nurses but, instead, "were tasked with coordinating the family's receipt of third-party services, including educational, legal, medical, or housing services." Appellant Br. 20. Implicit in this argument is the notion that merely facilitating medical care and ensuring that necessary medical treatment was received by the at-risk children is not enough.

This argument again turns on the text of the statute and the meaning of "provide" and "providing" as used in § 24(b). The American Heritage Dictionary of the English Language defines "provide" expansively and includes, *inter alia*, "[t]o make available (something needed or desired); furnish." American Heritage Dictionary of the English Language 1419. Similarly, Webster's New World Dictionary Third College Edition defines the verb "provide" as "make available." Webster's New World Dictionary Third College Edition 1083 (1988). This interpretation is consistent with the First Circuit's evaluation of a similar argument. *Gelin*, 712 F.3d at 619 (reasoning that the defendants "construe[d] the verb 'provide' too narrowly," and defining "provide" to mean "make available"). "Provide" does not mean "provide *directly*" as Manamela suggests.

We conclude that SCOH providers "made available" a medical item, benefit, or service because they were integral to ensuring that at-risk children received medical care by acquiring proof of such care (immunization records and records of visits to doctors) and providing reports of that medical care to the City. The fraud committed by

10

Manamela resulted in at-risk children did not receiving the medical care that MEBH represented the children as having received, including care to the 14-year-old girl whose death triggered the initial investigation of MEBH. Manamela's actions are an example of the quintessential type of fraud that is often the basis for convictions under § 1347. *See Gelin*, 712 F.3d at 619 (collecting cases); *Lucien*, 347 F.3d at 52 (fraudulently billed medical expenses). That MEBH employees also provided other services under the contract with the City is of no moment. And were we to adopt Manamela's position here, we could be drastically limiting the scope of § 1347 by excluding medical social workers involved in the delivery of medical items, benefits, or services. We will not take such a limited approach to interpreting a clearly worded and broad statute.

Manamela's second argument is that his actions were not "in connection with the delivery of or payment for health care benefits, items, or services," as required by § 1347. Relying on our decision in *United States v. Jones*, 471 F.3d 478, 482 (3d Cir. 2006), Manamela argues that *Jones* is factually analogous because "[t]he record is bereft of any evidence that Mr. Manamela, or others at MEBH, delivered a medical service to any child or family." Appellant Br. 22. Contrary to Manamela's position, *Jones* does not control this case as it was primarily focused on distinguishing *fraud*, prohibited under 18 U.S.C. § 1347, from *theft*, prohibited under 18 U.S.C. § 669. 471 F.3d at 481–82. There was unquestionably fraud present in this case. As explained above, the SCOH program was an integral part of the delivery of health care benefits, items, and services as MEBH was to document the receipt of medical care, facilitate appointments, and generally assure that at-risk children were being provided medical care. What is more, *Jones* does not

11

speak to what *types* of fraudulent activity are covered under the statute.

Our analysis makes patent that Manamela suffered no prejudice because his proffered interpretations of § 1347 and § 24(b) contradict the statutes. What is more, a § 2255 motion does not require a hearing if the "files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The motion, files, and records of this case conclusively show that Manamela is not entitled to relief because his legal claim lacks merit, and it was not an abuse of discretion for the District Court to decline to permit discovery or hold an evidentiary hearing. *See Glunt*, 667 F.3d at 404 ("A district court abuses its discretion when discovery is essential for the habeas petitioner to develop fully his underlying claim." (internal citation and quotation marks omitted)); *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008) (explaining that "the District Court's decision not to hold an evidentiary hearing will be an abuse of discretion unless it can be conclusively shown that [the defendant] cannot make out a claim for ineffective assistance of counsel").[2]

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[2] Because we will affirm on the ground that Manamela suffered no prejudice under *Strickland* from his counsel's failure to argue that his conduct fell outside the scope of the health care fraud statute, we need not address the Government's contention that Manamela's other arguments in support of prejudice in this case would not be "cognizable" under § 2255.